UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| MARY J. DOWNING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:12-CV-22 |
| | ) | |
| DEPARTMENT OF HEALTH | ) | |
| AND HUMAN SERVICES, *sued as* | ) | |
| *Kathleen Sebelius, Secretary*, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Mary J. Downing, proceeding *pro se*, appeals to the district court from a final decision of the Secretary of the Department of Health and Human Services ("Secretary") denying her Medicare Part B coverage for six ambulance transports. (Docket # 1.) Pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72(b), and Local Rule 72-1, District Judge Theresa Springmann referred this case to the undersigned Magistrate Judge for the issuance of a Report and Recommendation. (Docket # 31.)

Having reviewed the record, the undersigned Magistrate Judge recommends that the Secretary's decision be AFFIRMED. This Report and Recommendation is based on the following facts and principles of law.

### I. PROCEDURAL HISTORY

Between July 17, 2008, and September 17, 2008, Downing used an ambulance six times to see her physicians in Fort Wayne, Indiana. (*See* Tr. 152-57.) The ambulance service subsequently submitted claims to National Government Services ("NGS"), a Medicare

1

contractor, for payment. (Tr. 8; *see* Tr. 290-96.) NGS denied the claims initially, and Downing appealed (Tr. 290-301); NGS ultimately upheld the denials on March 30, 2009 (Tr. 228-30, 286-87).

Downing requested reconsideration of the denials on October 2, 2009. (Tr. 221-26.) In November, the Medicare Qualified Independent Contractor ("QIC") handling the case dismissed the request as untimely. (Tr. 130-32.) An administrative law judge ("ALJ") ultimately vacated this dismissal and remanded the case to the QIC for a decision on the merits. (*See* Tr. 110-13.)

On reconsideration, the QIC denied the claims. (Tr. 80-88.) Downing timely appealed the QIC's decision and requested an administrative hearing. (Tr. 76-79.) ALJ Gary D. Smith conducted a telephonic hearing on March 31, 2011, at which Downing, who was represented by counsel, testified. (Tr. 311-33.) On April 13, 2011, the ALJ rendered an unfavorable decision to Downing, concluding that the six disputed ambulance transports did not meet the origin and destination requirements for Medicare coverage because she was transported to her physicians' offices, which were not "covered destinations." (Tr. 8-14.)

Downing requested review of the ALJ's decision. (Tr. 21-33.) On December 5, 2011, the Medicare Appeals Council ("Council") reviewed and adopted the ALJ's decision. (Tr. 3-6.) Like the ALJ, the Council determined that Medicare did not cover the six ambulance transports because, contrary to Downing's assertions, there was no evidence she was transported to a hospital rather than a physician's office, and, as such, the transports failed to meet the origin and destination requirements. (Tr. 3-6.) The Council's decision stands as the final decision of the Secretary. *See Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir. 2001).

Downing filed a complaint with this Court on January 24, 2012, seeking relief from the

Secretary's final decision. (Docket # 1.) In her appeal, Downing argues that, contrary to the Council's decision, she was *not* transported via ambulance to her physicians' offices, but rather to The Orthopedic Hospital and Dupont Hospital. (Opening Br. 2-3; Reply 9-11.)

## II. FACTUAL BACKGROUND

### *A. Background*

Downing has been paraplegic and wheelchair-bound since a car accident in 1966. (Tr. 297, 332.) In April 2008, she fractured her right knee and left femur when she fell out of her wheelchair during a "right of way" accident. (Tr. 164-67, 180, 324, 329-30.) The femur fracture required the insertion of a rod in her left leg. (*See* Tr. 166-67, 297, 324.)

Due to her condition, Downing has an indwelling urinary catheter. (Tr. 297-98, 321.) On June 6, 2008, Downing was experiencing problems with her catheter, and Three Rivers Ambulance Authority ("TRAA") transported her to Lutheran Hospital's emergency room for treatment. (Tr. 185-86, 192, 319.) At Lutheran, Downing's catheter was replaced, and she was subsequently discharged. (Tr. 185-86.) While TRAA was transporting Downing from Lutheran to her home, Downing felt that her catheter was not working properly and asked to be taken to Parkview Hospital. (Tr. 189.) The emergency room physician at Parkview offered to flush Downing's catheter, but when it began draining slowly, she declined. (Tr. 185-86.) After she was discharged, TRAA transported Downing back to her home. (Tr. 190, 194.) The costs of these ambulance trips—from Downing's home to Lutheran, from Lutheran to Parkview, and from Parkview back to her home—were partially covered by Medicare; the remainder was written off. (*See* Tr. 192-96, 199.)

In the months following this hospital visit, Downing continued to experience problems

3

with her catheter, including bleeding and blood clots. (*See* Tr. 319-21.) At some point, Lutheran Hospital emergency room physicians told Downing that they could not help her and that she required specialized physicians.[1] (Tr. 320.) Downing started seeing an orthopedist and urologist (Tr. 320) and on six separate occasions—July 17, 2008; July 30, 2008; August 20, 2008; September 9, 2008; September 15, 2008; and September 17, 2008—used TRAA for transport to these specialists, apparently because they insisted she come to them (Tr. 152-57, 321).

### B. *Downing's Testimony at the Hearing*

At the hearing before the ALJ, Downing's attorney asked her whether she had "at any point . . . use[d] the ambulance services to transport [her] to [her] physician's offices." (Tr. 320.) Downing responded, "Yes," and then explained why she needed to be transported via ambulance. (Tr. 320-21.) Throughout the remainder of the hearing, Downing's counsel continued to refer to Downing being transported to her physicians' offices. (Tr. 322-23, 325-27.)

### III. STANDARD OF REVIEW

Once the Secretary has rendered a final decision on a Medicare claim, judicial review of that decision is available in the same manner as provided in 42 U.S.C. § 405(g) for old age and disability claims arising under Title II of the Social Security Act. *Heckler v. Ringer*, 466 U.S. 602, 605 (1984); *see also* 42 U.S.C. § 1395ff(b)(1)(A) (stating that "any individual dissatisfied with any initial determination under subsection (a)(1) of this section" is entitled to reconsideration, a hearing by the Secretary, and "to judicial review of the Secretary's final decision after such hearing as is provided in section 405(g) of this title").

Section 405(g) grants this Court "the power to enter, upon the pleadings and transcript of

---

[1] It is unclear whether this occurred during Downing's June 6th visit to Lutheran or another visit.

4

the record, a judgment affirming, modifying, or reversing the decision of the [Secretary], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wood*, 246 F.3d at 1029 (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the Secretary's denial of coverage was based on legal error. *Id.* (citing *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997)).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Secretary's. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Jones v. Shalala*, 10 F.3d 522, 523 (7th Cir. 1993). Rather, if the findings of the Secretary are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Wood*, 246 F.3d at 1029. Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Secretary's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### A. *The Law*

Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, known as the Medicare Act, "is a federally-subsidized health insurance program primarily for elderly and disabled individuals." *Abraham Lincoln Mem'l Hosp. v. Sebelius*, 698 F.3d 536, 541 (7th Cir. 2012) (internal quotation marks and citation omitted). The Medicare program is divided into four major components—Parts A, B, C, and D. *Id.* This appeal concerns Part B, which provides supplementary medical insurance benefits to cover, among other things, certain home health

5

services, specific medical and other health services, and outpatient physical and occupational therapy. *Id.*; *see* 42 U.S.C. § 1395k(a).

The Act defines the term "medical and other health services" as used in § 1395k(a)(2)(B) to include "ambulance service where the use of other methods of transportation is contraindicated by the individual's condition, but . . . only to the extent provided in regulations." 42 U.S.C. § 1395x(s)(7). According to the regulations, Medicare Part B covers ambulance services if, among other requirements, "the service meets the medical necessity and origin and destination requirements of paragraphs (d) and (e) of this section." 42 C.F.R. § 410.40(a)(1). Paragraph (e) sets forth the origin and destination requirements and provides that Medicare covers the following ambulance transportation:

> (1) From any point of origin to the nearest hospital, CAH, or SNF[2] that is capable of furnishing the required level and type of care for the beneficiary's illness or injury. The hospital or CAH must have available the type of physician or physician specialist needed to treat the beneficiary's condition.
>
> (2) From a hospital, CAH, or SNF to the beneficiary's home.
>
> (3) From a SNF to the nearest supplier of medically necessary services not available at the SNF where the beneficiary is a resident, including the return trip.
>
> (4) For a beneficiary who is receiving renal dialysis for ESRD, from the beneficiary's home to the nearest facility that furnishes renal dialysis, including the return trip.

42 C.F.R. § 410.40(e).

The Medicare Benefit Policy Manual ("MBPM") provides more guidance on these origin

---

[2] CAH is an abbreviation for "critical access hospital," 42 C.F.R. § 400.202, and SNF stands for "skilled nursing facility," 42 C.F.R. § 400.200.

and destination requirements.³ According to the MBPM, Medicare covers ambulance transports to *only* a hospital, CAH, SNF, beneficiary's home, or dialysis facility for a ESRD patient who requires dialysis; it explicitly states that a physician's office is not a covered destination, but provides an exception when, "under special circumstances," an ambulance transport temporarily stops at a physician's office. CTRS. FOR MEDICARE & MEDICAID SERVS., MEDICARE BENEFIT POLICY MANUAL, Pub. 100-2, Ch. 10, § 10.3 (2010); *see also* Medicare Program; Coverage of Ambulance and Vehicle and Staff Requirements, 64 Fed. Reg. 3637-01, 3642 (Jan. 25, 1999) ("It is also important to note that, generally, Medicare does not provide coverage for ambulance transportation to a physician's office, for example, transportation to a physician's office for a follow-up visit with an attending physician."). Section 10.3.8 further addresses this exception, explaining that ambulance service to a physician's office is covered only when the ambulance transport is en route to a Medicare covered destination as described in § 10.3, and, during the transport, the ambulance stops at a physician's office due to the patient's dire need for professional attention and then, immediately thereafter, continues to the covered destination. MBPM, Pub. 100-2, Ch. 10, § 10.3.8.

*B. The ALJ's and the Council's Decisions*

On April 13, 2011, the ALJ rendered his decision. (Tr. 8-14.) He found that from July 17, 2008, through September 17, 2008, TRAA transported Downing from her residence to her physicians' offices and then back to her residence. (Tr. 10.) He then concluded that the six disputed ambulance transports did not meet the origin and destination requirements for Medicare

---

³ Although not binding on the Secretary, manuals issued by the Centers for Medicare & Medicaid Services provide guidance in interpreting regulations and are, as a general matter, entitled to "considerable deference." *See Abraham Lincoln Mem'l Hosp.*, 698 F.3d at 542 (internal quotation marks and citations omitted).

coverage because transportation to a physician's office is not a covered destination under the regulations or the MBPM and there was no evidence that an exception applied. (Tr. 14.)

Downing asked the Council to review the ALJ's decision (Tr. 21-33), arguing that she met the origin and destination requirements because she was taken to The Orthopedic Hospital to be x-rayed and treated, which, Downing asserted, is across the street from Lutheran Hospital and considered a hospital by the Fort Wayne Medical Society (Tr. 25). Downing further contended that she "was never in any offices but went to a specific hospital building for specific specialized treatments." (Tr. 25.)

On December 5, 2011, the Council adopted the ALJ's decision (Tr. 3-6), concluding that the evidence indicated that Downing was transported to and from a physician's office on the six days in question and that the exception for a temporary stop at a physician's office en route to a covered destination did not apply (Tr. 5). The Council also specifically addressed Downing's contention that she was taken to a hospital, and not a physician's office, stating the following:

> The evidence in the record does not indicate that the beneficiary received treatment at a hospital on the dates of the transports at issue. Further, there is no indication that the transports were to a hospital. During the ALJ hearing, questions asked to the beneficiary by her attorney, referred to the beneficiary's transport to a physician's office. While the appellant now contends that she was transported to a hospital, the documentation in the record does not support that assertion.

(Tr. 5 (citation omitted).) Ultimately, the Council, like the ALJ, determined that the six ambulance transports did not meet the regulations' origin and destination requirements and, as such, were not covered by Medicare. (Tr. 5.) The Council further found that the limitation on liability provisions in 42 U.S.C. § 1395pp did not apply to this case, making Downing financially responsible for the six ambulance transports. (Tr. 5-6.)

8

## C. The Council's Decision is Supported by Substantial Evidence and Does Not Contain Legal Error

The central dispute between the parties is whether, on the six dates in question, TRAA transported Downing via ambulance to a hospital or to her physicians' offices. Downing contends that she was transported to either The Orthopedic Hospital, where her orthopedist took x-rays of her leg, or Dupont Hospital, where her urologist adjusted her catheter. (*See* Opening Br. 2-3; Reply 9-10.) The Secretary maintains that the evidence establishes that Downing's transports were to her physicians' offices and not a hospital. (*See* Sec'y's Resp. to Pl.'s Br. & Mem. in Supp. of Sec'y's Final Decision 10-12.) Addressing this very issue, the Council determined that the documentation in the record did not support the assertion that Downing was transported to a hospital rather than her physicians' offices. (Tr. 5.) The question now is whether that determination is supported by substantial evidence. *See Jens*, 347 F.3d at 212; *Wood*, 246 F.3d at 1029. As explicated below, substantial evidence *does* support this determination, and, as such, a remand is not warranted.

Downing maintains that on some of the days in question—though she does not specifically identify which ones—TRAA took her to The Orthopedic Hospital to have her leg x-rayed and treated and then back home. (Tr. 23.) According to the record, Downing saw her orthopedist at Fort Wayne Orthopaedics ("FWO") on July 30, 2008, and September 17, 2008—the dates of two of the disputed ambulance transports—for followup on her femur fracture and x-rays. (Tr. 175-78.) The medical records for these visits list FWO's address as 7601 W. Jefferson Blvd. (Tr. 175-78.)

During the administrative process, Downing submitted several documents in support of her claim that she was taken to a hospital. (*See* Tr. 27-33.) One of these documents—the Fort

9

Wayne Medical Society's listing of area medical facilities—indicates that The Orthopedic Hospital's "Main Campus – Inpatient" is located at 7952 W. Jefferson Blvd., while its "Off Campus" facility for both outpatient surgery and outpatient rehabilitation is located at 7601 W. Jefferson Blvd. (Tr. 28), the same address listed for FWO (Tr. 175-78). Furthermore, The Orthopedic Hospital website states that its "[FWO] location offers outpatient services and includes X-ray, MRI, and rehabilitation facilities." (Tr. 29.) It also indicates that The Orthopedic Hospital was founded in 2006 and that, in May 2008, Lutheran Hospital and FWO teamed up to enhance orthopedic care in the region. (Tr. 29.) And a map of The Orthopedic Hospital Downing submitted shows FWO on the 7601 campus across the street from The Orthopedic Hospital in the Lutheran Medical Park; the map further includes under the FWO logo the phrase "physician offices."[4] (Tr. 214.)

As such, and based on the documentation in the record, FWO, while associated with The Orthopedic Hospital, seems to be a distinct, outpatient facility from The Orthopedic Hospital's main, inpatient facility—one that teamed up with The Orthopedic Hospital in 2008, two years after the hospital's founding and appears to house physicians' offices. This is significant because the Act defines "hospital" as an institution, which, among other requirements, "is primarily engaged in providing, by or under the supervision of physicians, to *inpatients* (A) diagnostic services and therapeutic services for medical diagnosis, treatment, and care of injured disabled, or sick persons, or (B) rehabilitation services for the rehabilitation of the injured, disabled, or sick persons." 42 U.S.C. § 1395x(e)(1) (emphasis added); *accord* CTRS. FOR MEDICARE & MEDICAID SERVS., MEDICARE GENERAL INFO., ELIGIBILITY, & ENTITLEMENT

---

[4] Downing attached an updated and better-quality map to her reply that verifies this information. (Reply Br. 4.)

MANUAL, Pub. 100-1, Ch. 5, § 20 (2009).  Therefore, FWO, which holds itself out as housing "physician offices" and provides services to outpatients rather than primarily inpatients, does not appear to be a hospital under the Act.

As to Downing's other four transports, nothing in the record indicates where Downing was specifically transported on July 17, 2008, and August 20, 2008.  But, as Downing generally contends that on the six days in question she was treated by either her orthopedist or urologist, the Court will presume she was transported to see one of those physicians on these two dates.  In her appeal of the NGS's initial denial, Downing indicates that TRAA transported her to her urologist on September 9, 2008, and September 15, 2008, but does not state where these visits occurred.  (Tr. 299.)  At the hearing before the ALJ, Downing confirmed that she used TRAA for transport to her "physicians' offices."  (Tr. 320.)

Yet, for the first time, Downing contends in her opening brief that she visited her urologist at Dupont Hospital.  (Opening Br. 2.)  This "evidence"—which is nothing more than Downing's unsupported assertion—was not before the Council when it rendered its decision, and, therefore, this Court cannot consider it.  *See Eads v. Sec'y of Health & Human Servs.*, 983 F.2d 815, 816-817 (7th Cir. 1993); *Collins v. Astrue*, No. 1:10cv47, 2010 WL 4193028, at *10 (N.D. Ind. Oct. 19, 2010).  Doing so would change this Court's role "from that of a reviewing court to that of an administrative judge, required to sift and weigh evidence in the first instance, rather than limited as [it is] to reviewing evidentiary determinations made by the front-line factfinder."  *Eads*, 983 F.2d at 817-18 (citing *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 538 (7th Cir. 1992)).  And, even if the Court were to consider it, Downing provides no evidentiary support for her contention that she saw her urologist at Dupont Hospital; in fact, the

11

documentation in the record suggests just the opposite—that on all six occasions in question, Downing was seen at a physician's office.

This documentation consists of the claims that TRAA submitted for Medicare coverage. (*See* Tr. 152-57, 304-09.) The claims for TRAA's transports of Downing on July 17, July 30, September 9, and September 15, 2008, contain the billing code, or HCPCS code, "A0428-RPGY." (Tr. 152-53, 155-56, 304-05, 307-08.) The remaining two claims—for August 20, 2008, and September 17, 2008—both use the billing code "A0428-PRGY." (Tr. 154, 157, 306, 309.) According to the Medicare Claims Processing Manual ("MCPM"), the HCPCS code "A0428" is used for basic life support, non-emergency ambulance transports. CTRS. FOR MEDICARE & MEDICAID SERVS., MEDICARE CLAIMS PROCESSING MANUAL, Pub. 100-4, Ch. 15, § 30B (2011). The first two alpha characters after the HCPCS code represent an origin or destination code. *Id.* at § 30A. As used in the claims for all six transports in question, "P" means a transport to or from a physician's office and "R" indicates a transport to or from a residence.[5] *Id.* Therefore, the billing codes on the claims themselves suggest that Downing was transported to, or from, a physician's office, providing further support for the Council's conclusion that the documentation in the record did not support the assertion that Downing was transported to a hospital.[6]

And although Downing now contends she was transported to a hospital, throughout much

---

[5] The "GY" modifier refers to non-covered mileage. MCPM, Pub. 100-4, Ch. 15, § 30.2.4; *see also id.* at Ch. 1, § 60.4.2.

[6] In contrast, the billing codes used for Downing's ambulance transports on June 6 and 7, 2008, were "A0428-RH" for the trip from her residence to Lutheran Hospital, "A0428-HHGZ" for the transport from Lutheran to Parkview Hospital, and "A0428-HRGZ" for the ride back to her residence. (Tr. 195-96, 199.) The origin or destination code "H" stands for hospital. MCPM, Pub. 100-4, Ch. 15, § 30A. Unlike Downing's transports coded with "RP" or "PR," indicating that they were to or from a physician's office, Medicare partially covered the transports coded with "RH," "HH," or "HR," indicating they were to or from a hospital. (*See* Tr. 192-94.)

of the administrative process, she indicated that she was transported to her physicians' offices.
For instance, during the hearing before the ALJ, when her attorney asked her whether she had "at
any point . . . use[d] the ambulance services to transport [her] to [her] physician's offices,"
Downing responded in the affirmative. (Tr. 320-21.) Throughout the remainder of the hearing,
Downing's counsel referred to Downing being transported to her physicians' offices six more
times. (Tr. 322-23, 325-27.) The Council explicitly mentioned these statements in its decision,
noting that "[d]uring the ALJ hearing, questions asked to the beneficiary by her attorney,
referred to the beneficiary's transport to a physician's office." (Tr. 5.) Moreover, in a letter
appealing the QIC's decision to deny Medicare coverage for the six transports, Downing writes,
"Other means of transportation other than an ambulance could not have been used without
endangering my health; therefore, I had to take an ambulance to my *physician's office*." (Tr. 79
(emphasis added).)

     Finally, touching on the exception for a temporary stop at a physician's office en route to
a covered destination, Downing further asserts in this letter that "[a]fter receiving treatment from
[her] specialists, there was no need to take the ambulance to the emergency room." (Tr. 79.)
She reiterates this fact in her Opening Brief, stating, "After treating my conditions by specialized
physicians, there was no need to continue to second destinations." (Opening Br. 3.) Therefore,
Downing concedes that this exception does not apply here.

     In light of the lack of evidence in the record indicating that Downing was transported to a
hospital on any of the six days in question and the wealth of evidence suggesting that she was
taken to her physicians' offices, the Council's conclusion that the documentation in the record
did not support Downing's assertion that she was transported to a hospital—and that these

13

transports, therefore, did not meet the origin and destination requirements—is supported by substantial evidence and does not contain legal error. Although the Court is sympathetic to Downing's situation, there is simply not enough—in fact, barely any—evidence in the record that casts doubt on the Council's decision or necessitates a remand.

As a final matter, the Council held that because coverage was denied based on Downing's failure to satisfy the origin and destination requirements, the limitation on liability provisions in 42 U.S.C. § 1395pp did not apply to her case. (Tr. 5.) This section of the Act "provides financial relief to beneficiaries, providers, practitioners, and other suppliers by permitting Medicare payment to be made, or requiring refunds to be made, for certain services and items for which Medicare payment would otherwise be denied." HCFAR 95-1, 1995 WL 940742, at *1. Specifically, § 1395pp "requires the Secretary to reimburse for services if (1) coverage is denied 'by reason of section 1395y(a)(1) or (9)' or by section 1395pp(g), and (2) the beneficiary and medical service provider 'did not know, and could not reasonably have been expected to know, that payment would not be made.'" *Kaplan ex rel. Estate of Kaplan v. Leavitt*, 503 F. Supp. 2d 718, 725 (S.D.N.Y. 2007) (quoting 42 U.S.C. § 1395pp(a)).

But the Department of Health and Human Services has stated that when "[p]ayment of ambulance services is denied because transportation by other means is not contraindicated or because regulatory criteria specified in 42 [C.F.R. §] 410.40, *such as those relating to destination* or nearest appropriate facility, are not met," then Medicare payment is denied on the basis of § 1395x(s)(7), and not § 1395y(a)(1).[7] HCFAR 95-1, 1995 WL 940742, at *5. As such,

---

[7] Neither § 1395y(a)(9), which covers expenses for custodial care, 42 U.S.C. § 1395y(a)(9), nor the remaining sections listed in § 1395pp(a)(1) that also trigger the limitation on liability are at issue in this case, *see Kaplan*, 503 F. Supp. 2d at 725.

although Downing does not take issue with it, the Council's determination that the limitation on liability provisions did not apply to Downing's ambulance transports, making her financially responsible for them, is also supported by substantial evidence. *See Kaplan*, 503 F. Supp. 2d at 725 (holding that the limitation on liability provisions did not apply in an ambulance coverage case when the claim was denied because of failure to meet the "nearest appropriate hospital" element of 42 C.F.R. § 410.40(e)'s origin and destination requirements).

## V. CONCLUSION

For the foregoing reasons, the undersigned Magistrate Judge recommends that the Secretary's final decision be AFFIRMED.

The Clerk is directed to send a copy of this Report and Recommendation to Plaintiff Mary J. Downing and counsel for the Secretary. NOTICE IS HEREBY GIVEN that within fourteen days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings or recommendations. FED. R. CIV. P. 72(b). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.

SO ORDERED.

Enter for this 6th day of March, 2013.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge